

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

RAYMOND R. HENDERSON,

>      Plaintiff,

v.                                          Civil Action No. 3:12cv600

LABOR FINDERS OF VIRGINIA, INC., <u>et al.</u>,

>      Defendants.

MEMORANDUM OPINION

This matter is before the Court on the defendant Labor Finders of Virginia, Inc.'s ("Labor Finders") MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINTS (Docket No. 103). For the reasons set forth herein, the motion will be granted in part and denied in part.

PROCEDURAL BACKGROUND

The <u>pro se</u> plaintiff, Raymond R. Henderson ("Henderson"), initially brought this action against thirteen defendants alleging employment discrimination on the basis of his sex, in violation of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e et. seq., as well as several state law causes of action, allegedly subject to the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Henderson's original Complaint (Docket No. 3) alleged that the defendants subjected him to harassment and to a hostile work environment on the basis of his sex, specifically by engaging in sexual stereotyping.

(Compl. ¶ 4). On October 31, 2012, Henderson filed a motion (Docket No. 46) requesting an extension of the time allowed for amending his complaint pursuant to Fed. R. Civ. P. 15(a)(1)(A) & (a)(2). By Order dated November 2, 2012 (Docket No. 52), the Court granted that motion and further directed Henderson to particularize his complaint and to attach to the complaint any "right to sue" notices issued to him by the Equal Employment Opportunity Commission ("EEOC") in connection with this matter.

Henderson filed his First Amended Complaint (Docket No. 79) on November 19, 2012 and, with the Court's leave, filed a Second Amended Complaint (Docket No. 85) on December 3, 2012. Thereafter, all of the defendants filed motions to dismiss. By Memorandum Order dated February 20, 2013 (Docket No. 139), the Court granted the motions to dismiss, for lack of subject-matter jurisdiction, as to twelve of the defendants as Henderson had failed to name them in his EEOC complaint. Remaining before the Court is Labor Finders' MOTION TO DISMISS (Docket No. 103) pursuant to Fed. R. Civ. P. 12(b)(6).

## FACTUAL ALLEGATIONS
## AND CLAIMS AGAINST LABOR FINDERS

At this stage, the Court, as it must, "accept[s] all well-pleaded allegations in the plaintiff's complaint as true and draw[s] all reasonable factual inferences from those facts in the plaintiff's favor." Edwards v. City of Goldsboro, 178 F.3d

231, 244 (4th Cir. 1999). With that in mind, the facts, which are derived from the Second Amended Complaint (Docket No. 85), are alleged to be as set forth below.[1]

In April 2010, Henderson started working for Labor Finders of Virginia, Inc. at a branch located on Chamberlayne Avenue in Richmond, Virginia.[2] Although the policy was to give preference to employees based on whether or not they had their own transportation, Henderson, who had transportation, was only assigned to a project "when it was difficult finding someone to fill a work assignment." (Second Amend. Compl. ¶ 130). Henderson alleges that this was because the Branch Manager and Assistant Branch Manager selected employees based on who would make a "good representative of Labor Finders" (id.) and they did not believe Henderson was a good representative because Henderson "did not appear to meet [their] expectations of what an employee should be as a male or a female." (Id. at ¶ 131).

Over the next year or so, Henderson was assigned to jobs only when no other employee could be found. At those jobsites, he was routinely subjected to verbal epithets. He was regularly

---

[1]   The Second Amended Complaint, which is eighty pages long, contains numerous factual allegations that pertain to the other defendants. For the purposes of brevity, the Court merely cites the alleged facts that are directly relevant to the claims against Labor Finders.

[2]   Henderson had previously worked for Labor Finders from September 2004 to June 2005 at the West Broad Street location.

referred to as a "homosexual," a "faggot," or "gay" by employees at the jobsites. At other locations, he was told that he "looked just like a woman." (id. at ¶ 152.8) or that he "did not meet [the employer's] standards of a man." (Id. at ¶ 152.2). The employees at the jobsites consistently, and universally, indicated that they did not want to continue to work with Henderson.

Henderson made numerous written complaints to the Labor Finders' management, but received no response. On at least one occasion, Henderson overheard the Labor Finders Branch Manager assuring an employee that he would not have to work with Henderson; Henderson was subsequently not assigned to that project. (Id. at ¶¶ 138-39). On another occasion, Henderson was told by the Branch Manager that he was being assigned to a project only after the Branch Manager had trouble finding someone to take the assignment because Henderson did not have the "certain requirements" to be a good "representative" of Labor Finders. (Id. at ¶¶ 142-43). Henderson also heard one of the managers at one of the projects comment to the Labor Finders Branch Manager that Henderson was "a woman" and "gay" and that the Branch Manager should not have sent "somebody like [Henderson]" to the jobsite. (Id. at ¶ 150.3). In April 2011, Henderson was told that a member of Labor Finders' management

had told employees at one of the other sites that Henderson was "a homosexual and a troublemaker." (Id. at ¶ 155).

In addition to the widespread negative treatment that Henderson received at the various job sites to which he was assigned, he also alleges (somewhat vaguely) that he overheard statements at the Labor Finders branch consistent with comments that he was not a "real man" (id. at ¶ 171), that he was "a woman pretending to be something else, because he . . . was definitely not a male or a man." (id. at ¶ 173), and that he "looked just like a woman." (Id. at ¶ 175). He also alleges, specifically, that on April 1, 2011, he heard a Labor Finders employee tell another, in the presence of the Assistant Branch Manager, that Henderson was "'sweet' like a woman." (Id. at 178.1). On April 8, 2011, Henderson overheard an employee comment, in the presence of the Assistant Branch Manager, that Henderson was a "bitch" and a "homo." (Id. at ¶ 178.2). Several days later, Henderson overheard the Assistant Branch Manager comment to an employee that Henderson was "gay" and a "woman." (Id. at ¶ 181.1). A few days after that, on April 19, 2011, Henderson heard the Assistant Manager tell the Branch Manager that Henderson was "a 'faggot' and not a man." (Id. at ¶ 181.2). On April 22, 2011, Henderson heard the Assistant Branch Manager tell the Branch Manager that Henderson was a "woman." (Id. at ¶ 183.1). During May and April 2011, Henderson also overheard

numerous comments made by Labor Finders employees in the presence of the Branch Manager or Assistant Branch Manager that Henderson was "gay," that he "looked like a 'woman,'" or that he was "crazy." (Id. at ¶¶ 186.1-186.2). On May 31, 2011, Henderson heard a Labor Finders employee comment to another, in the presence of the Branch Manager, that "somebody was going to harm [Henderson] because he was a 'woman' and that they did not want to work with somebody like that." (Id. at ¶ 191.3). On June 14, 2011, Henderson overheard a Labor Finders employee state, in the presence of the Branch Manager, that the plaintiff was "a homo" and "not a man because a man wants a woman." (Id. at ¶ 194.1). On June 20, 2011, Henderson overheard various threats of violence against him for being a "woman" and a "homo" announced in the presence of the Labor Finders Assistant Branch Manager. (Id. at ¶ 194.2). Henderson tried, on numerous occasions, to complain to Labor Finders management, both in Richmond and elsewhere, about what he was observing at the Labor Finders branch office and on the various jobsites. He never received a reply and, on July 26, 2011, Henderson overheard various employees discussing how Henderson was going to lose his job at Labor Finders because he was a "troublemaker with his complaints" and could not be sent on assignments without creating problems for Labor Finders. (Id. at ¶ 202).

6

Henderson's Second Amended Complaint makes claims against Labor Finders in Counts I, II, IV, VII, VIII, and IX. Counts I and II reflect federal claims brought for alleged violation of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e-2(a). The remaining counts assert a number of ancillary state law claims for Defamation (Count IV), Invasion of Privacy (Count VII), Intentional Infliction of Emotional Distress (Count VIII), and Negligence (Count IX). On December 17, 2012, Labor Finders filed its MOTION TO DISMISS (Docket No. 103) and Memorandum in Support (Docket No. 104), challenging all claims raised in the Second Amended Complaint. On January 7, 2013, Henderson filed a document titled as an opposition to the motion to dismiss (Docket No. 134), which reflected a general opposition to the arguments made by Labor Finders in its motion. The time for an reply having passed with no reply having been filed, the motion is ripe for review.

## LEGAL STANDARD

The purpose of a motion made pursuant to Fed. R. Civ. P. 12(b)(6) is "to test the legal sufficiency of the complaint." Randall v. United States, 30 F.3d 518, 523 (4th Cir. 1994). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S.

7

662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Courts should assume the veracity of all well-pleaded allegations in a complaint, and should deny a motion to dismiss where those well-pleaded allegations state a plausible claim for relief. Id. at 679. A claim is "plausible" when the plaintiff pleads facts sufficient to allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. Twombly, 550 U.S. at 556. A court should grant a motion to dismiss, however, where the allegations are nothing more than legal conclusions, or where they permit a court to infer no more than a possibility of misconduct. See Iqbal, 556 U.S. at 678-79.

"A document filed pro se is to be liberally construed and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). Of course, "Principles requiring generous construction of pro se complaints are not . . . without limits." Beaudett v. City of Hampton, 775 F.2d 1274, 1277 (4th Cir. 1985). "The 'special judicial solicitude' with which a district court should view such pro se complaints does not transform the court into an advocate. Only those questions which are squarely presented to a court may

8

properly be addressed." Weller v. Dept. of Social Serv., 901 F.2d 387, 391 (4th Cir. 1990).

**DISCUSSION**

## Henderson's Federal Claims

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that it is unlawful for an employer to

> (1) fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). The Supreme Court of the United States has made clear that "discrimination" is "not limited to 'economic' or tangible discrimination.'" Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986). Rather, Title VII is intended "to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." City of Los Angeles Dept. of Water & Power v. Manhart, 435 U.S. 702, 707 n.13 (1978). As a result, "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal quotations and citations omitted).

Title VII and Gender Stereotyping

As an initial observation, this action presents a tension between two well-settled principles of law. First, there is no question that "Title VII does not afford a cause of action for discrimination based on sexual orientation." Wrightson v. Pizza Hut of America, Inc., 99 F.3d 138, 143 (4th Cir. 1996). At the same time, "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their [gender] group." Price Waterhouse v. Hopkins, 490 U.S. 228, 250 (1989) (plurality opinion).[3]

---

[3] Although there does not appear to be direct precedent from the Fourth Circuit, the overwhelming majority of Courts of Appeal have applied Price Waterhouse to permit recovery, under Title VII, for a male employee who is discriminated against for failing to comply with accepted gender norms. See e.g., Dawson v. Bumble & Bumble, 398 F.3d 211, 218 (2d Cir. 2005) ("[I]ndividual employees who face adverse employment actions as a result of their employer's animus toward their exhibition of behavior considered to be stereotypically inappropriate for their gender may have a claim under Title VII."); Smith v. City of Salem, Ohio, 378 F.3d 566, 575 (6th Cir. 2004) ("Sex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination."); Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257, 262-63 (3d Cir. 2001) ("[A] plaintiff may be able to prove that same-sex harassment was discrimination because of sex by presenting evidence that the

Of course, it is often difficult to draw the distinction between discrimination on the basis of gender stereotyping and discrimination on the basis of sexual orientation. After all, "sex stereotyping is central to all discrimination: Discrimination involves generalizing from the characteristics of a group to those of an individual, making assumptions about an individual because of that person's gender, assumptions that may or may not be true." Centola v. Potter, 183 F. Supp. 2d 403, 408-09 (D. Mass. 2002). "Stereotypical notions about how men and women should behave will often necessarily blur into ideas about heterosexuality and homosexuality. A homosexual male exhibiting an attraction toward other males in the workplace would not be behaving as a man would stereotypically be expected to behave." Howell v. North Central College, 320 F. Supp. 2d 717, 723 (N.D. Ill. 2004). The distinction is further complicated by a trend of advice encouraging homosexual plaintiffs who are discriminated against based on their sexual orientation to bring Title VII claims under a gender-stereotyping theory. See e.g., Kristin

---

harasser's conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her gender."); Nichols v. Azteca Restaurant Enterprises, Inc., 256 F.3d 864, 874 (9th Cir. 2001) (recognizing a Title VII claim where "the systematic abuse directed at [the plaintiff] reflected a belief that [he] did not act as a man should act"); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 261 n.4 (1st Cir. 1999) ("[A] man can ground a claim on evidence that other men discriminated against him because he did not meet stereotyped expectations of masculinity.").

Bovalino, How the Effeminate Male Can Maximize His Odds of Winning Title VII Litigation, 55 Syracuse L. Rev. 1117, 1134 (2003) ("[G]ay plaintiffs bringing claims under Title VII should emphasize the gender stereotyping theory and de-emphasize any connection the discrimination has to homosexuality.").

Further muddling the analysis is the fact that, as a result of the well-documented relationship between perceptions of sexual orientation and gender norms, gender-loaded language can easily be used to refer to perceived sexual orientation and vice versa. See e.g., Spearman v. Ford Motor Co., 231 F.3d 1080, 1086 (7th Cir. 2000) ("Curtis called him a 'bitch' which, according to Gibson, means a 'woman,' or a 'faggot.'"); Doe v. City of Belleville, 119 F.3d 563, 593 n.27 (7th Cir. 1997) ("Indeed, a homophobic epithet like "fag," for example, may be as much of a disparagement of a man's perceived effeminate qualities as it is of his perceived sexual orientation."). Amidst all of this, the Court must be cognizant that Title VII does not necessarily prohibit "any form sexually tinged teasing" and the plaintiff cannot recover where the situation alleged is just "gross, vulgar, male horseplay in a male workplace." English v. Pohanka of Chantilly, Inc., 190 F. Supp. 2d 833, 847-48 (E.D. Va. 2002). With those principles in mind, the Court turns to the case at hand.

Employment Discrimination Claim

To establish a prima facie case of employment discrimination, the plaintiff must show (1) that he is a member of a protected class, (2) that he was qualified for his job and his performance was satisfactory, (3) that despite his qualifications and performance he suffered some adverse employment action, and (4) that similarly situated employees who were not members of the protected class did suffer the same adverse actions. See Love-Lane v. Martin, 355 F.3d 766, 787 (4th Cir. 2004).

Labor Finders moves to dismiss this claim asserting that Henderson "fails to allege any facts to support" the various elements of the claims. Mem. in Supp. at 4. Further, says Labor Finders, all factual allegations that Henderson makes refer to his sexual orientation. Id.

Under Count I of his Second Amended Complaint, Henderson asserts that he was subject to "discriminatory behaviors and actions" because of "sexual stereotyping." (Second Amend. Compl. at ¶ 209). Examining the factual allegations in the Second Amended Complaint, accepting them as true and construing the Second Amended Complaint liberally as the work of a pro se plaintiff, it appears that Henderson's basic theory of the case is this: that Labor Finders refused to assign him to prestigious projects and, indeed, was reluctant to assign him to any

13

projects at all, because Labor Finders' management felt that Henderson's failure to conform with accepted gender norms reflected poorly on Labor Finders and would displease its clients. Henderson asserts that he was not afforded the preference in assignments that he would have otherwise received as a result of having his own transportation (Second Amend. Compl. at ¶ 128), and that this was a result of Labor Finders' belief that Henderson did not comply with accepted gender norms. (Id. at ¶ 131).

Throughout his Second Amended Complaint, Henderson alleges a number of specific instances of his being selected for a work assignment reluctantly and only when no one else was available, which he alleges was inconsistent with the expected assignment system. In addition, he alleges several instances of the decision-making supervisors at Labor Finders commenting that Henderson was a "faggot," or a "woman," or "not a man." Henderson alleges that this indicates discrimination on the basis of sex. Of course, while a plaintiff must allege specific facts to support his claim, "intent may be pleaded generally (which is to say, in a conclusory fashion)." Burks v. Raemisch, 555 F.3d 592, 594 (7th Cir. 2009); see also Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). As discussed above, a Title VII claim for discrimination based on sex can be based on

14

discrimination against an employee for failing to comply with sexual stereotypes.[4]

It may be true that "the unequivocal allegation that he was discriminated against 'because of his sex,' which for the purposes of Rule 12(b)(6) must be accepted as true, is alone sufficient to withstand [a] motion to dismiss." <u>Wrightson v. Pizza Hut of America, Inc.</u>, 99 F.3d 138, 143-44 (4th Cir. 1996). Even if it were not, here Henderson has alleged numerous examples of unfavorable employment actions taken against him as well as substantial iterations of conduct by Labor Finders supervisors that could plausibly be viewed as discrimination on the basis of sex. It may be that the evidence will demonstrate that the behavior resulted from perceived sexual orientation or simple animosity, but at this stage, Henderson has met his pleading burden.

Accordingly, Labor Finders' motion to dismiss as to Count I will be denied.

---

[4] Henderson is a heterosexual male. (Second Amend. Compl. at ¶ 206). Thus, this action does not present the problem of attempting to bootstrap discrimination on the basis of sexual orientation into a Title VII claim under the notion that a sexual attraction to another male does not comply with gender norms regarding appropriate "male" behavior. That claim would be barred by unequivocal precedent. Rather, Henderson's claim is that both the obviously gendered epithets (e.g. "bitch" and "woman") as well as those more traditionally associated with sexual orientation (e.g. "faggot," "homo," and "gay") were all intended to denote accusations of effeminacy.

Hostile Work Environment Claim

In order to plead a prima facie case of a hostile work environment, a plaintiff must allege "that the offending conduct (1) was unwelcome, (2) was based on [his] sex, (3) was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment, and (4) was imputable to [his] employer." Bonds v. Leavitt, 629 F.3d 369, 385 (4th Cir. 2011) (internal quotations omitted). Further, "the third element requires that the plaintiff show that the work environment was not only subjectively hostile, but also objectively so." Id. Whether an environment is "hostile" or "abusive" must be determined by looking at the circumstances. "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). A proper application of this "objectively hostile" standard will "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotations omitted).

An employer can be held vicariously liable for a hostile work environment where the environment was "created by a

16

supervisor with immediate (or successively higher) authority over the employee." Faragher, 524 at 807. Where there is not an allegation of a "tangible employment decision," the employer may assert an affirmative defense on the basis "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. Where the hostile work environment is predicated on the abusive behaviors of co-workers, employer liability can only attach where the complaining employee has complained directly to the employer and the employer has failed to adequately respond. See Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 267 (4th Cir. 2001). That is, "the employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it." Hoyle v. Freightliner, LLC, 650 F.3d 321, 334 (4th Cir. 2011).

Labor Finders moves to dismiss Count II on the basis that Henderson has failed to "allege any facts to support a plausible claim for harassment or that the harassment was sufficiently

severe or pervasive to create an abuse working environment." Mem. in Supp. at 6 (emphasis in original).[5]

Here, Henderson has alleged a pattern of behavior either conducted by his supervisors at Labor Finders or by other employees in the presence of, and with the countenance of, those supervisors over a period of several months. Indeed, he alleges specific instances during the course of April and May 2011 in which, on a nearly daily basis, he was exposed to offensive language and, ultimately, with threats of violence. He further made numerous attempts to report this behavior to senior management at Labor Finders and, according to Henderson, rather than address the problem, his supervisors began spreading the word that he was a "troublemaker" who was not long for his job.

In Spriggs v. Diamond Auto Glass, 242 F.3d 179, 182 (4th Cir. 2001), the Fourth Circuit reversed a grant of summary judgment against an employee who alleged that he had been exposed to a hostile work environment as a result of "incessant racial slurs, insults, and epithets." The Court of Appeals found that the "frequent and highly repugnant insults were sufficiently severe or pervasive (or both) to cause a person of ordinary sensibilities to perceive that the work

---

[5] There is no question that Henderson has alleged that the conduct was unwelcome. Further, for the reasons set forth above, at this stage of the proceedings, the Court accepts Henderson's allegation that the conduct was motivated by his perceived failure to comply with gender norms.

atmosphere . . . was racially hostile." Id. at 185. Similarly, in EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 20008), the Court of Appeals found sufficient evidence that the harassment was "persistent, demeaning, unrelenting, and widespread," where a Muslim employee was repeatedly referred to as "Taliban" and was frequently mocked for his kufi and beard.

At its core, the question is whether or not Henderson has pled facts adequate to demonstrate that the harassment was "crude, persistent, demeaning, unrelenting, and widespread." Harris v. L&L Wings, Inc., 132 F.3d 978, 984 (4th Cir. 1997). Accepting the factual allegations in the Second Amended Complaint as true, it appears that Henderson has adequately alleged a claim. He alleges having been subjected to frequent and pervasive slurs and insults based on his sex, culminating in threats of violence for continuing to work at Labor Finders. This behavior certainly rises to the level of objectively hostile. Further, Henderson alleges numerous attempts to notify Labor Finders management of this treatment as well as actual knowledge and participation by his supervisors in the behavior (as well as, of course, tangible harm to his employment status). These allegations are sufficient to impute liability to the employer.

Accordingly, Labor Finders' Motion to Dismiss, as to Count II, will be denied.

**Henderson's State Law Claims**

In addition to the two claims (Counts I and II) that are brought pursuant to Title VII, Henderson asserts a number of state law claims under the Court's pendent jurisdiction. See 28 U.S.C. § 1367(a). As against Labor Finders, Henderson asserts claims for Defamation (Count IV); Invasion of Privacy (Count VII); Intentional Infliction of Emotional Distress (Count VIII); and Negligence (Count IX). Counts III, V, VI, and X-XIII do not purport to state claims against Labor Finders at all.

Defamation

In Count IV, Henderson alleges a claim for defamation against Labor Finders. In that Count, Henderson asserts that Labor Finders made statements that "involved defamatory words that imputed unfitness to plaintiff in performing the duties of his employment and prejudiced him in his employment, which constitutes 'Defamation Per Se.'" (Second Amend. Compl. at ¶ 233). Labor Finders seeks to dismiss this Count because it is barred by the relevant statute of limitations. Mem. in Supp. of Mot. to Dismiss at 6.

Under Virginia law, an action for defamation must be brought within one year after the cause of action accrues. Va. Code § 8.01-247.1 ("Every action for injury resulting from libel, slander, insulting words or defamation shall be brought within one year after the cause of action accrues."). Assuming,

20

arguendo, that Henderson's defamation cause of action would have accrued on the last date in the Second Amended Complaint that identifies disparaging language, which was July 26, 2011, the action would have had to have been brought before July 26, 2012. Of course, "if any action is commenced within the prescribed limitation period and for any cause abates or is dismissed without determining the merits, the time such action is pending shall not be computed as part of the period within which such action may be brought, and another action may be brought within the remaining period." Va. Code § 8.01-229(E)(1).

On April 3, 2012, Henderson filed a complaint in this Court asserting, inter alia, his defamation claim against Labor Finders. See Henderson v. Vasco Inc, et al., No. 3:12cv244-HEH.[6] On April 12, 2012, Henderson's complaint was dismissed, without reaching the merits, for failing to exhaust his administrative remedies as to his federal claims. Mem. Order, 3:12cv244-HEH at Docket No. 2 (E.D. Va. April 12, 2012). Although Henderson appealed that decision to the United States Court of Appeals for the Fourth Circuit, the pendent state law claims were no longer pending before any court as they were not subject to the appeal

---

[6] On December 30, 2011, Henderson filed a complaint asserting many of the same claims present here. See Henderson v. Vasco, Inc., 3:12cv866-JRS. Labor Finders was not a defendant in that action and, therefore, the statute of limitations was not tolled (as to any claim against Labor Finders) during the pendency of that action.

and could be retained or dismissed at the court's discretion. See 28 U.S.C. § 1367(c)(3); see also Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995).

Excluding the days during which the action was pending, Henderson had to file his defamation claim no later than August 6, 2012.[7] Subsequently, on August 20, 2012, Henderson filed this action.[8] Therefore, the Court finds that Henderson's defamation claim is barred, under Virginia law, by the relevant statute of limitations.

Accordingly, Count IV of the Second Amended Complaint will be dismissed.

Invasion of Privacy

Count VII of the Second Amended Complaint alleges a claim for invasion of privacy against Labor Finders for violating "the

---

[7] By the Court's calculation, the statute of limitations would have expired on August 4, 2012, which is a Saturday. "When the last day for performing an act during the course of a judicial proceeding falls on a Saturday, . . . the act may be performed on the next day that is not a Saturday." Va. Code § 1-210.

[8] This action was filed on August 20, 2012, but was not docketed pending the Court's review of Henderson's request to proceed in forma pauperis. On September 19, 2012, the Court granted the motion to proceed in forma pauperis, and the Complaint was docketed. However, it was not until Henderson's First Amended Complaint (Docket No. 79), filed November 19, 2012, that Henderson asserted a defamation claim against Labor Finders. Because Henderson's initial motion for leave to proceed in forma pauperis was filed after the date provided by the statute of limitations, the Court need not determine at which exact point the action was suitably "commenced."

plaintiff's right to solitude and freedom from prying public eyes." (Second Amend. Compl. at ¶ 253).

Virginia does not recognize a common law cause of action for invasion of privacy. See Cohen v. Sheehy Ford of Springfield, Inc., 27 Va. Cir. 161 (Va. Cir. Ct. 1992); see also Bellotte v. Edwards, 388 F. App'x 334, 339 (4th Cir. 2010) ("Virginia courts have never recognized a common law tort of invasion of privacy."). Virginia does, however, recognize a limited statutory right for invasion of privacy where an individual's "name, portrait, or picture is used without having first obtained the written consent of such person." Va. Code § 8.01-40. The Supreme Court of Virginia has recognized that "[b]y codifying only the [misappropriation of name and likeness], the General Assembly has implicitly excluded the [other common law torts of invasion of privacy] as actionable torts in Virginia." WJLA-TV v. Levin, 564 S.E.2d 383, 394 n.5 (2002). Henderson has not asserted any facts that would support a cause of action under Va. Code § 8.01-40.

Accordingly, Count VII of the Second Amended Complaint is dismissed.

### Intentional Infliction of Emotional Distress

Count VIII of the Second Amended Complaint alleges a claim for intentional infliction of emotional distress against, inter alia, Labor Finders. Henderson alleges that the behaviors of the

23

Labor Finders employees were intentional, malicious, and resulted in injuries to Henderson's "health, peace of mind and comfort," caused "mental anguish and distress," and various harms to his reputation and business relationships. (Second Amed. Compl. at ¶¶ 261-264).

Under Virginia law, a party asserting a claim for intentional infliction of emotional distress must establish that

> One, the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved. Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was severe.

Womack v. Eldridge, 210 S.E.2d 145, 148 (Va. 1974). In order to properly allege the fourth element of the claim (i.e., that the distress was "severe"), it is insufficient to make mere conclusory statements regarding severity. See Russo v. White, 400 S.E.2d 160, 163 (Va. 1991); see also Papasan v. Allain, 478 U.S. 265, 286 (1986) (noting that courts need not "accept as true a legal conclusion couched as a factual allegation"). In Russo, the Virginia Supreme Court indicated that a claim for

24

intentional inflection of emotional distress was inadequate where the plaintiff alleged "she was nervous, could not sleep, experienced stress and "its physical symptoms," withdrew from activities, and was unable to concentrate at work" but did not allege "any objective physical injury caused by the stress, that she sought medical attention, that she was confined at home or in a hospital, or that she lost income." Russo, 400 S.E.2d at 163.

Here, Henderson has failed to allege facts sufficient to support the finding that the emotional distress was "severe." Instead, he merely makes conclusory allegations that there was injury to his health and peace of mind. Under Virginia law, this is insufficient to maintain a claim for intentional inflection of emotional distress.

Accordingly, Count VIII of the Second Amended Complaint will be dismissed.

### Negligence

Count IX of the Second Amended Complaint alleges "negligence" on the part of Labor Finders. In essence, Henderson alleges that Labor Finders' conduct, and failure to respond to the conduct of others, "led to the breach of [its] obligation to the plaintiff." (Second Amend. Compl. at ¶ 269).

To make a claim of negligence under Virginia law, a plaintiff must show "a legal duty on the part of the defendant,

25

breach of that duty, and a showing that such breach was the proximate cause of injury, resulting in damage to the plaintiff." Blue Ridge Serv. Corp. v. Saxon Shoes, Inc., 624 S.E.2d 55, 62 (Va. 2006). Here, as Labor Finders notes, Henderson merely alleges that there was a "breach of [its] obligation" to him by Labor Finders. This is, at best, nothing more than a conclusory recitation of the second element. Henderson makes no allegations that would establish the existence of a legal duty. Henderson has failed to adequately allege the elements of the negligence claim.

Accordingly, Count IX of the Second Amended Complaint will be dismissed.

## CONCLUSION

For the reasons set forth above, defendant Labor Finders of Virginia, Inc.'s MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINTS (Docket No. 103) will be granted in part and denied in part. The motion will be denied as to Counts I and II of the Second Amended Complaint. The motion will be granted as to Counts IV, VII, VIII, and IX. Counts III, V, VI, and X-XII will be dismissed as they are directed solely at parties no longer in this action.

It is so ORDERED.

_____ /s/ _____REP_____

Richmond, Virginia                    Robert E. Payne
Date: April _1_, 2013                 Senior United States District Judge

26